# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| LAJUANA R. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:13-CV-2-AGF-NAB |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| Acting Commissioner of Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Lajuana Williams' ("Williams") application for benefits

under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 42 U.S.C.

§§ 1381 *et seq.* Williams alleged disability due to heart disease, high blood pressure, diabetes,

glaucoma, kidney problems, allergies, acid reflux, and a pinched nerve in her back, which caused

lower back, leg, and knee pain. (Tr. 163.) This matter was referred to the undersigned United

States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) for a report and recommendation.

[Doc. 6.]

## I.    Background

On February 20, 2008, Williams completed her applications for supplemental security

income ("SSI") and disability insurance benefits ("DIB"). (Tr. 115, 118.) The Social Security

Administration ("SSA") denied Williams' claim and she filed a timely request for a hearing

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

before an administrative law judge ("ALJ").  (Tr. 66–71, 72–78.)  The SSA granted Williams'

request and a hearing took place on July 9, 2009.  (Tr. 21–56, 88.)  On August 11, 2009, the ALJ

issued a written decision upholding the denial of benefits.  (Tr. 8–19.)  Williams requested

review of the ALJ's decision by the Appeals Council.  (Tr. 6–7.)  On December 3, 2010, the

Appeals Council denied Williams' request for review.  (Tr. 1–5.)  Williams appealed to the

United States District Court Eastern District of Missouri.  *Williams v. Astrue*, 4:11-CV-57 AGF,

2012 WL 946806 (E.D. Mo. Mar. 20, 2012).  On March 20, 2012, the District Court reversed

and remanded the decision of the ALJ because the ALJ failed to provide an adequate basis for

discrediting the opinion of the treating physician Heather Sateia, M.D.  (Tr. 599–625.)

Upon remand, the ALJ held a supplemental hearing on October 24, 2012.  (Tr. 539–560.)

On November 8, 2012, the ALJ issued another decision upholding the denial of benefits.  (Tr.

520–538.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  20

C.F.R. § 404.984(a) ("when a case is remanded by a Federal court for further consideration, the

decision of the [ALJ] will become the final decision of the Commissioner after remand . . .

unless the Appeals Council assumes jurisdiction of the case.")  Williams filed this appeal on

January 3, 2013.  [Doc. 1.]  Williams filed a Brief in Support of her Complaint.  [Doc. 18.]  The

Commissioner filed an Answer and Brief in Support of the Answer.  [Doc. 11, 23.]

## II.    Legal Standard

The Social Security Act defines disability as an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical impairment which can be

expected to result in death or has lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The SSA uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. §§ 404.1520, 416.920. "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger v. Barnhart*, 390 F.3d 584, 590–91 (8th Cir. 2004) (internal citation omitted). In this sequential analysis, the claimant first cannot be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must establish that she or he has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d).

Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work.[2] 20 C.F.R. §§ 404.1520(f), 416.920(f). At this step, the burden rests with the claimant to establish his or her RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f), 416.920(f). If it is determined that the claimant can still perform past relevant work, the claimant is not disabled. *Id.* If the claimant cannot perform past relevant work, the analysis proceeds to Step five.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. §§ 404.1520(g)(1),

---

[2] "Past relevant work is work that [the claimant] has done *within* the past 15 years, that was *substantial gainful activity,* and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (internal citations omitted).

416.920(g)(1). At this step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs in the economy. *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfies all of the criteria under the five-step evaluation, the ALJ will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The court reviews the ALJ's decision to determine whether the factual findings are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is less than preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## III.    Decision of the ALJ

The ALJ determined that Williams met the insured status requirements of the Social Security Act ("SSA") on the alleged onset date of disability, and had not engaged in substantial gainful activity since the alleged onset date of November 15, 2007.  (Tr. 525.)  The ALJ found that Williams had the following severe impairments: history of congestive heart failure and coronary artery disease, kidney failure with anemia, diabetes mellitus, and right knee tricompartmental osteoarthritis; but that Williams did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 526.)

Next, the ALJ determined Williams had the residual functional capacity ("RFC") to perform a full range of sedentary work, except that she could occasionally balance, stoop, crouch, kneel, crawl, and climb ramps and stairs; but she could never climb ladders, ropes, or scaffolds.  (Tr. 526.)  Based on the RFC, the ALJ determined that Williams was unable to perform any past relevant work, but considering her age, education, work experience, there are jobs in significant numbers in the national economy that she can perform.  (Tr. 531.)  Therefore, the ALJ concluded that Williams was not under a disability, as defined in the SSA, from November 15, 2007, though June 29, 2010.  (Tr. 532–533.)

## IV.    Administrative Record

The relevant evidence before the ALJ is as follows:

**A.       Hearing Testimony**

At the first administrative hearing, Williams and vocational expert Vincent Stock testified. At the second administrative hearing, Williams, vocational expert Dr. Charles Upton, and medial expert Dr. Charles Metcalf testified.

**1.       Williams' Testimony**

Williams testified that she was forty-nine years of age at the time of the first hearing. (Tr. 26.) She received a high school diploma and had vocational training where she received a certification in the field of data entry. (Tr. 27–28.) During the last fifteen years, Williams worked as a cashier, janitor, housekeeper, and daycare provider. (Tr. 29–32.) At the time of the initial hearing, Williams had been living alone in an apartment for the last ten years. (Tr. 25.) She had a rent subsidy and Medicaid coverage, and received financial support from her father. (Tr. 26–27, 46.)

Williams testified that she has been unemployed since 2007 because of chronic pain involving her back, knees, feet, legs, and hands. (Tr. 29, 32.) She stated that she could not stand more than ten minutes or walk more than a block and a half at a time, lift or carry more than five pounds, bend, stoop, or crouch. (Tr. 46.) She also testified that she could use her hands for normal tasks such as turning doorknobs and to handle zippers. (Tr. 42.) Williams testified that she has been treated for diabetes, hypertension, allergies, high cholesterol, water retention, chronic kidney disease, and a heart attack in 2002. (Tr. 37–43.)

Williams stated that the medications she took stabilized a fluid retention problem in her ankles and legs (Tr. 39.) Williams also stated she occasionally had to elevate her right knee to prevent swelling, especially during times of damp weather. (Tr. 47–48.) Williams testified that

she is able to feed, dress and bathe herself; do all normal household chores with rest periods; watch TV, and do puzzles. (Tr. 33–35.) She has no driver's license, but uses public transportation, and her daughter drives her when she needs to go grocery shopping. (Tr. 26, 28, 35.) Williams testified that she takes about two naps a day, and sometimes falls asleep while watching TV. (Tr. 49–50.) At the second hearing, Williams reported side effects of fatigue and urinary frequency. (Tr. 554–555.) Williams' testified that neuropathy causes her feet and hands to go numb. (Tr. 556.) As a result, she was prescribed Gabapentin, but she complained that the medication often made her sleepy. (Tr. 556.)

### 2.    VE Testimony

Vocational Experts Vincent Stock ("VE Stock") and Dr. Charles Upton ("VE Upton") testified as to Williams' past relevant work experience. VE Stock testified that Williams' previous work experience as a cashier was a light job, with a SVP of 2. (Tr. 51.) Williams' work as a janitor was medium exertional level, with a SVP of 3. (Tr. 52.) Williams' work as a daycare provider was light exertional level, with a SVP of 4. (Tr. 52.) Finally, Williams' work as a housekeeper was light, with a SVP of 6. (Tr. 52.) VE Upton confirmed that all of Williams' past relevant work would qualify as unskilled. (Tr. 558.)

The ALJ posed the following hypothetical question to VE Stock:

> Please assume a person the age of 49 with a high school education and the past relevant work experience that you have identified. Please assume I would find this person capable of performing the exertional demands of sedentary work as defined in the Social Security regulations. Specifically, the person can lift, carry, push, pull 10 pounds occasionally, less than 10 pounds frequently. Sit for 6 out of 8, stand, walk for 2 out of 8 for a total of 8 out of 8. I would limit the person to occasional climb, balance, stoop, crouch, kneel, or crawl. No exposures to ladders, ropes, scaffolds, or unprotected heights.

(Tr. 52.) Based on that hypothetical, VE Stock testified that Williams could not perform her past relevant work because all of her previous positions were at a greater exertional level than sedentary. (Tr. 52–53.) VE Stock testified that Williams could perform the jobs of security guard monitor and cashier. (Tr. 53.) VE Stock testified that to perform the jobs he listed, a person could not miss more than four days of work per month as a result of impairments or treatment. (Tr. 54–55.)

VE Upton testified that if an individual were absent twice or more per month on an ongoing basis, that would be too excessive to remain employed in an unskilled work force. (Tr. 558–559.) He also testified that if a person would need unscheduled breaks on an ongoing basis, that person would require an accommodation and may exceed an employer's tolerance. (Tr. 558–559.) VE Upton testified that to perform the jobs VE Stock listed, a person would need to be on task at least 90 percent of the time. (Tr. 559.) If an employee in unskilled jobs was off task more than ten percent of the time as a result of an interference with concentration, persistence and pace, that person would not be retained in that employment very long. (Tr. 559.)

### 3. Medical Expert Testimony

Medical Expert Dr. Charles Metcalf ("Metcalf") testified that in September 2002, Williams had a myocardial infarction, which resulted in significant ischemia. (Tr. 544.) A year later, she had another documented myocardial infarction. *Id.* The catheterization showed progression of the blockages in three coronary arteries, two of which had stents surgically placed in them. (Tr. 544.) In March 2007, there was an echocardiogram, which showed normal left ventricular function and no other particular problems. (Tr. 544.) In January 2008 and June 2008, Williams had swelling of the ankles, edema, and with the use of a diuretic, she lost twenty pounds within a matter of a few days. (Tr. 544.) In May 2011, she had another significant

edema, but no evidence of congestive heart failure.  (Tr. 544.)  In August 2011, it was noted that she was able to walk four blocks at a time.  (Tr. 544.)  Metcalf testified that in September 2012, Williams' doctor noted that she was doing well and no episodes of edema.  (Tr. 544.)

Metcalf concluded that based on the cardiac records, she had two significant myocardial infarctions in 2002 and 2003, she had probable evidence of congestive failure in 2008, but since that time, she had no significant symptomatology from the heart.  (Tr. 544.)  He also concluded that she had recovered fairly well from the heart attacks with the stenting.  (Tr. 544.)

Regarding Williams' diabetes, in 2002, she had an A1-C[3] of 12.1, but by 2007 her A1-C's ranged from nine down to seven-and-a-half.  (Tr. 545.)  In 2008, her A1-C ranged from nine down to seven-and-a-half.  (Tr. 545.)  Based on the variations in those two years, Metcalf testified that her diabetes was uncontrolled.  (Tr. 545.)  However, between 2009 and 2011, her A1-C levels were under better control; her levels ranged from 6.3 to 5.9.  (Tr. 545.)

Metcalf testified that in June 2010, Barnes Hospital noted that she had peripheral neuropathy symptoms, but they did not record any physical examination or testing to verify that they found evidence of it.  (Tr. 545.)  Metcalf testified that there was a diabetic retinopathy noted in 2007, but not sufficient to significantly affect her vision.  (Tr. 545.)  Her vision was 20/25 in each eye; she had normal angle glaucoma, and was successfully treated.  (Tr. 545.)  She had laser treatment for the retinopathy and injections and withdraws of fluid for the glaucoma.  (Tr. 545.)

Metcalf testified that it was unclear as to whether Williams' kidney failure was a result of a diabetic kidney problem or some other renal problem.  (Tr. 545.)  From 2007 to 2008, she had

---

[3] The A1C test is a common blood test used to diagnose type 1 and type 2 diabetes and reflects the average blood sugar level for the past two to three months.  http://www.mayoclinic.com/health/a1c-test/MY00142 (last visited December 12, 2013).  "Specifically, the A1-C test measures what percentage of your hemogloblin-a protein in red blood cells that carries oxygen- is coated with sugar (glycated).  The higher your A1C level, the poorer your blood sugar control and the higher your risk of diabetes complications."  *Id.*

an elevated creatinine[4] level as high as 3.3 and as low as 1.6. (Tr. 546.) Metcalf testified that the range of creatinine values that are acceptable should be under two, and a range of four or higher, meets a listing. (Tr. 546.) However, based on Williams' creatinine levels, Metcalf determined that while she may have a chronic renal problem, she was not going to meet a listing. (Tr. 546.)

Metcalf testified that Williams complained of joint pain in both hips and both knees. (Tr. 546.) He testified that there was a question in one record of a lumbosacral spine problem, but there was a lack of imaging evidence. (Tr. 546.) She had some x-rays and at least one MRI of the hip that documented mild to moderate osteoarthritis. (Tr. 546.) However, he testified that her joint problem is not disabling. (Tr. 546.) Her final problem is pulmonary. Metcalf testified that Williams had wheezing on several occasions and that one set of pulmonary function tests was conducted. (Tr. 546.) However, the results were not readable in the record, so Metcalf did not believe there was a significant problem as far as the record was concerned. (Tr. 545.)

Finally, Metcalf testified that between the dates of November 15, 2007 and April 11, 2008, Williams did not meet or equal any listing in the listing of impairments. (Tr. 547.) While she does have some weakness of cardiac function and mild evidence of osteoarthritis of the joints, Metcalf opined that he would place her at a sedentary level. (Tr. 547.) Metcalf noted that in May 2009, Dr. Sateia listed very severe restrictions on Williams' residual functional assessment. (Tr. 547.) Metcalf testified that he does not know the basis for this doctor's assessment. Metcalf testified that, contrary to Dr. Sateia's assessment, Williams could lift ten pounds on an occasional basis, five pounds on a frequent basis, stand or walk up to two hours in

---

[4] Creatinine tests "measure the level of the waste product creatinine in your blood and urine. These tests tell how well your kidneys are working. The substance creatine is formed when food is changed into energy through a process called metabolism. Creatine is broken down into another substance called creatinine, which is taken out of your blood by the kidneys and then passed out of your body in urine. … A high creatinine level may mean your kidneys are not working properly." *Creatinine and Creatinine Clearance*, WEBMD, http://www.webmd.com/a-to-z-guides/creatinine-and-creatinine-clearance (last visited December 17, 2013).

an eight-hour day, and no limitations on sitting. (Tr. 548.) However, Metcalf testified that he would limit Williams' postural activities such as stooping, crawling, and kneeling to no more than one-third of the day. (Tr. 548.) He would recommended eliminating Williams' unprotected heights altogether because he is not sure what degree of neuropathy she has, and would limit stair climbing to no more than occasional. (Tr. 548.)

When asked whether the medications Metoprolol, Neurontin, or Cyclobenzaprine caused fatigue, Metcalf testified that these medications may cause fatigue, but it is not an expected side effect of those drugs. (Tr. 549.) Metcalf then testified that depression may exacerbate or change an individual's experience of fatigue, but the record did not support the claim that Williams had fatigue to the level of drowsiness or sleepiness during the daytime. (Tr. 549.)

### B.    Medical Evidence

The medical evidence is as follows.

On September 17, 2002, Williams visited the emergency room at Barnes-Jewish Hospital for chest tightness and shortness of breath. (Tr. 237.) Williams' medical examination revealed that she had experienced a heart attack and she had a history of hypertension, diabetes, obesity, coronary artery disease and dyslipidemia. (Tr. 234–236.)

On October 15, 2003, Dr. Michael Beardslee treated Williams for complaints of continued chest pain. (Tr. 225.) At that time, Williams underwent stent placement surgeries. (Tr. 225.) A transthoracic echocardiogram from March 2007 demonstrated normal systolic functioning with moderate left ventricular hypertrophy and impaired relaxation. (Tr. 288-89.)

In July 2007, Dr. Chandra Ho of Barnes-Jewish's outpatient clinic examined Williams and noted that her medical conditions, including coronary artery disease, hypertension, and diabetes, were stable or controlled with medication. (Tr. 278.)

On January 28, 2008, Daniel Coyne, M.D., and Seth Goldberg, M.D., of Barnes-Jewish's outpatient clinic diagnosed Williams with stage IV chronic kidney disease based on her creatinine clearance of 2.4. (Tr. 258.) Williams was also diagnosed with renal insufficiency (renal osteodystophy) and anemia, but a renal sonogram performed on January 31, 2008 produced normal results. (Tr. 290.)

On March 10, 2008, Dr. Kabeya Mwintshi and Dr. Coyne examined Williams again and noted that her creatinine levels stabilized and encouraged her to work hard to better control her diabetes because it would improve her chronic kidney disease. (Tr. 493–94.) On June 5, 2008, Dr. Ho recorded pitting edema in the lower extremities; however, her physical examination was otherwise within normal limits and Dr. Ho assessed her with congestive heart failure exacerbation. (Tr. 436.) Dr. Ho prescribed Lasix for her heart condition, and requested she return for a follow-up. *Id.*

On June 19, 2008, Dr. Ho examined Williams. (Tr. 426-427.) Williams reported no symptoms of congestive heart failure; noting that her swelling had decreased and she had no shortness of breath. (Tr. 426.) Dr. Ho concluded Williams' congestive heart failure exacerbation had resolved and further noted that her diabetes, coronary artery disease, and hypertension were either stable or controlled. (Tr. 427.) Dr. Ho indicated that Williams' coronary artery disease was stable. *Id.*

On August 11, 2008, Dr. Bala Sankaraparadian and Dr. Coyne noted that Williams' chronic kidney disease had stabilized, but noted trace edema of the lower extremities. (Tr. 484–85.) At that time, Williams reported that her diuretics improved her edema. (Tr. 484.)

On February 16, 2009, Dr. Ethan Hoerschgen and Dr. Coyne again noted that Williams' chronic kidney disease had stabilized. (Tr. 480.) Williams reported no significant swelling in her legs. *Id.* Moreover, Williams reported feeling well except for experiencing fatigue with walking. (Tr. 479.) In July 2011, Dr. Biju Marath and Dr. Coyne evaluated Williams during a follow-up visit. (Tr. 794-795.) The examination showed Williams was baseline in renal function and her hypertension was adequately controlled. (Tr. 795.) An iron deficiency was found. (Tr. 795.)

On May 6, 2009, Dr. Heather Sateia evaluated Williams for knee pain and reported episodes of her knees "giving out." (Tr. 513.) Williams rated her knee pain as a two on a scale of one to ten, and stated that Tylenol and Tramadol helped her pain. *Id.* Dr. Sateia referred Williams for physical therapy and recommended she exercise to strengthen her knees. (Tr. 514.) On May 11, 2009, x-rays revealed mild to moderate tricompartmental osteoarthritis of the right knee. (Tr. 507.) On July 10, 2009, Dr. Sateia noted that Williams' diabetes and chronic kidney disease were stable, her blood pressure was low, hyperlipidia was at goal, medication had helped her peripheral neuropathy, and her back pain symptoms had improved. (Tr. 899.) Dr. Sateia recommended Williams exercise at home for knee pain and referred her to a dietician for weight loss. (Tr. 898.)

On May 21, 2009, Dr. Sateia completed a Physical RFC Questionnaire regarding Williams. (Tr. 464–68.) Dr. Sateia diagnosed Williams with chronic kidney disease, coronary artery disease, and congestive heart failure. (Tr. 464.) Dr. Sateia opined that Williams' impairments were severe enough to interfere on an occasional basis with her ability to concentrate and perform even simple work tasks. (Tr. 465.) Dr. Sateia opined that Williams would likely need two ten-minute breaks per day, that she could occasionally lift less than ten

pounds, rarely lift ten pounds, and never carry as much as twenty pounds.  (Tr. 466.)  She also opined that, during an eight-hour workday, Williams could stand for less than two hours, sit for at least six hours, and would likely be absent from work about four days per month due to her medical issues.  (Tr. 465–67.)  On October 6, 2009, Dr. Sateia noted that Williams' kidney disease was stable.  (Tr. 908.)  Dr. Sateia expressed to Williams the importance of diet and exercise to reduce strain on her joints.  (Tr. 908.)

On January 14, 2010, Williams reported right lower extremity pain.  (Tr. 917.)  Dr. Sateia noted that previous imaging of Williams' spine showed mild osteoarthritis and her physical examination did not support a finding of sciatica.  (Tr. 918.)  On April 8, 2010, Dr. Sateia found that Williams' diabetes was better controlled and her back pain and chronic kidney disease were stable.  (Tr. 929.)  On September 22, 2010, Williams reported episodes of frequent urination. (Tr. 957.)  Dr. Sateia determined that Williams had signs of a urinary tract infection.  (Tr. 958.)

## V.      Discussion

Williams asserts three errors on appeal. First, Williams argues that the ALJ failed to properly consider the effects of fatigue and frequent urination in assessing her RFC. Second, Williams contends that the ALJ failed to consider the effects of any non-severe impairment, specifically Williams' obesity.  Finally, Williams asserts that the ALJ gave great weight to a medical expert while affording little weight to her own treating physician.

### A.      Residual Functional Capacity

Williams contends that the ALJ's findings as to her RFC are not supported by evidence in the record because the ALJ failed to include the side effects of her medication, specifically fatigue and frequent urination.  RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments.  20 C.F.R.

§ 404.1545.  The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his or her limitations.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

The undersigned finds that the RFC determination is supported by substantial evidence in the record as a whole.  In this case, Williams asserts that her testimony regarding her symptoms and the medical evidence demonstrates that that the ALJ's RFC determination is not supported by substantial evidence.  "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them.  *Id.*  The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints.  *Id.*  The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the

claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record, which cause him or her to reject the claimant's complaints. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

Regarding Williams alleged symptom of frequent urination, the record contains no evidence supporting Williams' claim. The ALJ in this case obtained medical expert testimony from Dr. Charles Metcalf. (Tr. 543–54.) Speaking specifically to Williams' alleged frequent urination, Dr. Metcalf testified that she took a diuretic medication—Furosemide—which would cause increased urination if there were excess fluid in the body, as occurred in 2008. (Tr. 553.) However, since 2008, Dr. Metcalf testified that he did not see anything in the record that Williams continues to have side effects of the medication. (Tr. 553.) Dr. Metcalf also testified that a doctor would still prescribe Furosemide to a patient, even if he or she did not have excess fluid in the body, to treat hypertension. (Tr. 552.)

Moreover, the record shows that Williams reported only one instance of increased urinary frequency, which occurred in September 2010. (Tr. 957.) In fact, Williams denied changes of increased urine output during her routine visits with Dr. Sateia. (Tr. 821, 834, 847, 1032.) Since

2008, the record shows that Williams' extremity edema was either absent, or when it was present it was described as only "trace".  (Tr. 364, 370, 387, 395, 514, 821, 834, 848, 888, 958, 980, 988-989, 1032.)  There is no evidence in the record that her symptom of frequent urination increased substantially between May 2009 and October 2011.  Therefore, it was not error for the ALJ to rely on the medical expert testimony from Dr. Metcalf.

Furthermore, the undersigned agrees with the ALJ that the medical record does not establish ongoing complaints of fatigue that would prevent Williams from performing a limited range of sedentary work.  (Tr. 530.)  During her first and second hearing, Williams testified to activities of daily living, which indicated her ability to perform sedentary work, despite her alleged symptoms.  Williams described her daily activities as getting up, eating, reading, doing word find puzzles, cleaning the house, making the bed and doing dishes with the help of her friend, making meals, visiting with friends, and occasionally shopping and running errands.  (Tr. 33–35, 527.)  Such evidence may be considered in judging the credibility of her complaints.  *See Nguyen v. Chater*, 75 F.3d 429, 430–31 (8th Cir. 1996); *Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir. 1995).  Williams' activities are inconsistent with her complaints, and the ALJ's determination was supported by substantial evidence on the record.

Finally, Williams asserts that the hypothetical question proposed to the VE was incomplete because the ALJ failed to properly consider the effects of fatigue and frequent urination.  The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (*citing Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993)).  The undersigned has already found that the RFC determination by the ALJ is supported by substantial evidence.

Therefore, the ALJ did not commit error by excluding the limitations of fatigue and frequent urination.

### B. Effect of Obesity on Williams' Ability to Work

Williams argues that the ALJ erred in failing to consider the impact of her obesity on her ability to work. According to SSR 02-1p, "[o]besity can cause limitation of function. 2002 WL 34686281 at *5. "Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment . . . . [Each case is evaluated] based on the information in the case record." *Id.* at *6. "[S]omeone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. *Id.* "An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time." *Id.* It should be explained how a conclusion was reached on whether obesity caused any physical or mental limitations. *Id.* at 7.

Williams contends that the ALJ failed to include in the RFC assessment any functional limitations resulting from her obesity. While obesity can impose significant work related limitations, the undersigned finds that the ALJ's failure to discuss the effects of obesity on Williams' ability to work as harmless error. First, there is no evidence in Williams' medical records that indicates that any physician placed physical limitations on Williams' ability to perform work-related functions due to her obesity. *See McNamara v. Astrue*, 590 F.3d 607, 611 (8th Cir. 2010). Second, Williams' own Function Report fails to identify any limitations caused by obesity. (Tr. 197–204.) Third, Williams did not testify about her obesity affecting her ability to work. (Tr. 40–50, 554–57.) Moreover, the RFC limited Williams to sedentary work. (Tr.

526.)  Therefore, it was not reversible error for the ALJ's opinion to omit specific discussion of Williams' obesity.  *See McNamara*, 509 F.3d at 612 (not reversible error for ALJ to omit specific discussion of obesity where neither the medical records, nor claimant's testimony demonstrated obesity resulted in additional work-related limitations).

### C.    Medical Opinion Evidence

Finally, Williams contends that the ALJ erred because he improperly gave greater weight to a medical expert and gave little weight to her treating physician, Heather Sateia, M.D.  As previously explained, Dr. Sateia treated Williams since 2008.  Dr. Sateia completed a Physical RFC Questionnaire regarding Williams on May 21, 2009.  (Tr. 464–68, 530.)  In this case, the ALJ declined to give controlling weight to Dr. Sateia's opinion because her opinion was inconsistent with the other evidence of record, including her assessments of Williams made in the course of treatment.  (Tr. 530.)

In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record."  20 C.F.R. §§ 404.1527(b), 416.927(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians."  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).  "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole."  *Id.*

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937.

When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). The regulations require that the following factors be considered when evaluating medical opinion evidence: (1) whether source examined claimant, (2) existence of treatment relationship, (3) length of treatment relationship and frequency of examination, (4) nature and extent of treatment relationship, (5) relevant evidence supporting opinion, (6) consistency with record as a whole, (7) specialization, and (8) other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 20 C.F.R. 416.927(c).

"Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

The ALJ did not discount Dr. Sateia's opinion based on the treatment relationship or its length with Williams; the opinion was discounted specifically based on the other factors in the regulations including supportability and consistency in the record. (Tr. 530.) The ALJ's conclusions reflected Dr. Metcalf's findings. (Tr. 530.) Dr. Metcalf reviewed the medical evidence of record, which included evidence following Dr. Sateia's assessments. (Tr. 530, 544–48.) After reviewing Williams' medical records as a whole, Dr. Metcalf determined that Williams could lift ten pounds on an occasional basis, five pounds on a frequent basis; could stand or walk for up to two hours in an eight-hour day; would have no limitations sitting; would limit her postural activities and stair climbing; and eliminate unprotected heights altogether. (Tr. 548.) Dr. Metcalf diagnosed Williams with congestive heart failure, kidney failure, diabetes, and osteoarthritis, and found that all her conditions were stable and under control with medication. (Tr. 544–47.)

In Dr. Sateia's Physical RFC Questionnaire, she stated that Williams' impairments were severe enough to interfere on an occasional basis with her ability to concentrate and perform simple work tasks. (Tr. 463–68.) Dr. Sateia further noted symptoms of "pain, shortness of breath (occasionally), [and] chest pain," as well as bilateral knee pain and fatigue from Metoprolol. *Id.* This is the primary disagreement regarding Dr. Sateia's opinion. The ALJ's decision stated that there was "little objective evidence to support [this conclusion]." (Tr. 530.) Additionally, the ALJ noted that in subsequent treatment notes, Dr. Sateia routinely noted that Williams' conditions were stable. (Tr. 514, 866, 898, 907, 917, 929.) The ALJ also stated that imaging of Williams' knee pain revealed only mild to moderate abnormalities, (Tr. 917–19.), and "Dr. Sateia's physical examination for reports of back pain was not consistent with sciatica and previous imaging of [Williams'] back showed only mild osteoarthritis." (Tr. 530.)

In this case, there is evidence to support the ALJ's conclusions. Dr. Metcalf reviewed the medical evidence of record, which included evidence following Dr. Sateia's assessment. (Tr. 547.) Dr. Metcalf testified that the medications prescribed to Williams, specifically the Metoprolol, Neurontin, Cyclobenzaprine, and Baclofen would not ordinarily cause fatigue. (Tr. 549.) Moreover, Dr. Metcalf testified that based on the medical record as a whole, he saw nothing that would support a finding of fatigue to the level of drowsiness or sleepiness that Williams claimed. *Id.* He also testified that the medical record does not support the conclusion that Williams' degree of pain or medication side effects amount to a level that would interfere with her ability to concentrate or persist at tasks, or miss work to the level described in Dr. Sateia's Physical RFC Questionnaire . (Tr. 550–53.) In other words, Dr. Metcalf concluded that he found nothing in the record to substantiate Dr. Sateia's assessment of Williams.

Based on the foregoing, the ALJ's decision not to give controlling weight to Dr. Sateia's opinion was supported by substantial evidence. Dr. Sateia's Physical RFC Questionnaire does not identify any objective medical findings that support her opinion that Williams would miss or be absent from work more than four days per month, or the sit, lift, and carry requirements. (Tr. 464–68.) It is clear that Dr. Sateia's restrictions are based on Williams' subjective complaints. Therefore, the ALJ was entitled to give less weight to her opinion.

## VI.    Conclusion

Substantial evidence in the record as a whole supports the ALJ's conclusion that Williams' physical impairments do not significantly limit her ability to perform basic work activities. Based on the foregoing, the undersigned recommends that the ALJ's decision be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Williams in her Complaint and Plaintiff's Brief in Support of Complaint be **DENIED**.  [Doc. 1, 14.]

**IT IS FURTHER RECOMMENDED** that Judgment be entered in favor of the Commissioner.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Carolyn W. Colvin for Michael J. Astrue in the court record of this case.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *See Halpin v. Shalala*, 999 F.2d 342, 345 (8th Cir. 1993).

Dated this 17th day of December, 2013.


  /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE